No. 68,926

NADINE N. JONES, *Appellant*, v. MERIDA HANSEN and CARL HANSEN, *Appellees*.

(867 P.2d 303)

Opinion filed January 21, 1994.

*Robert C. Littrell*, of Manhattan, argued the cause and was on the briefs for appellant.

*Steve R. Fabert*, of Fisher, Patterson, Sayler & Smith, of Topeka, argued the cause, and *J. Steven Pigg*, of the same firm, was with him on the brief for appellees.

The opinion of the court was delivered by

DAVIS, J.: This is a premises liability action. Plaintiff, while a social guest in the home of the defendants, fell down a flight of stairs, severely injuring herself. She appeals from a summary judgment entered in favor of the defendants. Summary judgment was based upon the undisputed facts and the court's conclusion that defendants did not breach the duty to refrain from wilfully, wantonly, or recklessly injuring plaintiff.

The question presented is whether this court should change Kansas law regarding the duty owed by an occupier of land to a social guest licensee by adopting a standard of reasonable care under all the circumstances. Under present Kansas law, the duty owed to an entrant upon property is dependent upon the status of the entrant. A majority of this court believes that a partial change in our premises liability law is warranted as more reflective of modern social mores and as a more reasonable method of fault determination in our society.

Before addressing plaintiff's question, we must deal with defendants' contention that the issue of change in Kansas law was not properly preserved because it was not presented to the trial court. There is no dispute that the issue was raised before the trial court during oral argument, but the parties disagree about whether the question was sufficiently raised so as to preserve it for appeal. See, *e.g.*, *Schmeck v. City of Shawnee*, 232 Kan. 11, 35, 651 P.2d 585 (1982). In *Enlow v. Sears, Roebuck & Co.*, 249 Kan. 732, 822 P.2d 617 (1991), we declined to consider an appellant's claim that res ipsa loquitur supported her negligence claim when she raised it only at oral argument on appellee's motion to dismiss. Res ipsa loquitur was not included as a theory

in the pretrial order and no instructions were requested in *Enlow*. 249 Kan. at 737-38. Similarly, in this case the plaintiff raised her claim only upon oral argument to the trial court. She did not allege her position in her petition, nor did she argue it in her written reply to defendants' motion for summary judgment.

However, this case differs from *Enlow* in that the plaintiff in this case seeks a determination that present Kansas law should be changed. This is clear from the argument plaintiff presented in opposition to defendants' motion for summary judgment:

"MR. LITTRELL [Plaintiff's counsel]: There are a number of policy issues that are issues that we cannot address in the District Court level. But in times past the doctrines of contributory negligence have been overturned by the court, the guest statutes have been repealed by the legislature. We think that we've got an equally unfair situation that exists here in premises liability laws as they exist in the State of Kansas and that it's time that the court—higher court needs to consider changing and adopting the Restatement of Torts, which is a much more realistic view of the way the world works and especially insurance law, and what one guards against and who is able to pay the best. . . .

. . . .

"MR. PIGG [Defendant's counsel]: . . . Plaintiff also argues that the law—premises liability law of Kansas should be changed. That's been argued several times in the not too distant past and has always been rejected. There's always been some dissent. Justice Prager [is] gone, he was generally the strongest dissent proponent of eliminating traditional premises liability laws, and the probability that that law will continue as it presently is is strong. . . .

. . . .

"THE COURT: Well, even if there was a home tour, there was no activity that involved the defendant Mrs. Hansen. The plaintiff was the one that was involved in the home tour and her injury was not caused by an activity brought about by defendant Mrs. Hansen. Mrs. Jones' testimony on page 20 of her deposition says 'So Mrs. Hansen said there were paintings in the other room? Yes. What did you do then? I said "May I look at them?" and she said yes.' That doesn't sound like an invitation to me, but rather a response to a request to take this home tour. . . . It may be ordinary negligence, it may not be. It's certainly unfortunate, but the discovery record in this case in no way suggests total indifference to the consequences and reckless disregard for the rights of others or a realization of the imminence of danger. You'll have an opportunity to argue the policy decisions to the higher court, Mr. Littrell."

Typically, a party may not raise an issue on appeal that was not presented to the trial court. We have, however, recognized

an exception when the issue raised is a question of law that may be decided on established facts. See *Board of Sedgwick County Comm'rs v. Kiser Living Trust*, 250 Kan. 84, Syl. ¶ 8, 825 P.2d 130 (1992). The issue argued before the trial court in this case fits within that exception because it is a question of law that may be decided on established facts. Moreover, the plaintiff did argue this issue before the trial court, but that court was duty bound to follow existing Kansas law. The defendants were given a full and fair opportunity to brief and argue the issue before this court. We conclude that the issue was considered by the trial court sufficiently to preserve the issue for appeal.

The facts in this case are not in dispute. Plaintiff was invited to play bridge in the defendants' home. When plaintiff had the dummy hand, she began looking at defendants' art work. Mrs. Hansen told her that there were more paintings in another room. That room was adjacent to the one in which bridge was being played, and it was dimly lit. Plaintiff testified she had to be within a foot of the paintings to see them. She did not ask the defendants where the light switch was located. There were two table lamps, one floor lamp, and eight ceiling floodlights available in the room. Only the floor lamp was lit. It was the first time plaintiff had been in the defendants' home. As plaintiff walked sideways around the room looking at the paintings, she fell down a flight of stairs and was severely injured.

The stairwell was blocked off on two sides with a 33-inch-high bookcase which defendants placed there to prevent people from just walking into the stairwell. There were three paintings hung on the wall above the stairwell. The paintings had hung at that location since 1977, and no one other than the plaintiff has been injured on the stairway.

## KANSAS LAW

Under Kansas law, the common-law classifications of trespassers, licensees, and invitees are used to determine the duty owed by an occupier of land to the entrants on the land. The duty owed is dependent upon the status of the entrant. This classification system has deep roots in Anglo-American jurisprudence as well as in Kansas law. In *Gerchberg v. Loney*, 223 Kan. 446,

448-49, 576 P.2d 593 (1978), this court summarized the duty of care owed to the classes of injured parties coming upon property:

"Under the present law of Kansas a trespasser is one who enters on the premises of another without any right, lawful authority, or an express or implied invitation or license. The possessor of premises on which a trespasser intrudes owes a trespasser the duty to refrain from wilfully, wantonly, or recklessly injuring him. (*Frazee v. St. Louis-San Francisco Rly. Co.*, [219 Kan. 661, 549 P.2d 561 (1976)]. See also PIK 2d [Civil] 12.20 and 12.21.)

"A licensee is one who enters or remains on the premises of another by virtue of either the express or implied consent of the possessor of the premises, or by operation of law, so that he [or she] is not a trespasser thereon. The possessor of premises on which a licensee intrudes owes a licensee the duty to refrain from wilfully or wantonly injuring him [or her]. (*Graham v. Loper Electric Co.*, 192 Kan. 558, 561, 389 P.2d 750 [1964]; *Weil v. Smith*, 205 Kan. 339, 469 P.2d 428 [1970]. See also PIK 2d [Civil] 12.10 and 12.11.)

"Under the law in this jurisdiction a social guest has the status of a licensee and his [or her] host owes him [or her] only the duty to refrain from wilfully, intentionally, or recklessly injuring him [or her]. (*Ralls v. Caliendo*, 198 Kan. 84, Syl. ¶ 1, 422 P.2d 862 [1967]; *Duckers v. Lynch*, 204 Kan. 649, 465 P.2d 945 [1970].)

"An invitee is one who enters or remains on the premises of another at the express or implied invitation of the possessor of the premises for the benefit of the inviter, or for the mutual benefit and advantage of both inviter and invitee. The possessor of premises on which an invitee enters owes a higher degree of care, that of reasonable or ordinary care for the invitee's safety. This duty is active and positive. It includes a duty to protect and warn an invitee against any danger that may be reasonably anticipated. (*Weil v. Smith* [205 Kan. 339], Syl. ¶ 3; *Graham v. Loper Electric Co.*, [192 Kan. at 563]. See also PIK 2d [Civil] 12.01 and 12.02.)"

Plaintiff was a social guest in defendants' home. Based on the law existing at the time of plaintiff's injury, defendants owed plaintiff only a duty to refrain from wilfully, intentionally, wantonly, or recklessly injuring her. Under existing Kansas law, the trial court properly granted defendants' motion for summary judgment based upon its finding that the "discovery record . . . in no way suggests total indifference to the consequences and reckless disregard for the rights of others."

Despite several invitations since *Gerchberg*, the majority of this court has elected to maintain the common-law classification of tort plaintiffs as trespassers, licensees, and invitees. *Bowers v. Ottenad*, 240 Kan. 208, 729 P.2d 1103 (1986); *Britt v. Allen County Community Jr. College*, 230 Kan. 502, 638 P.2d 914

(1982); *Zuther v. Schild*, 224 Kan. 528, 581 P.2d 385 (1978). This case is the first time in seven years that we have been asked to reevaluate whether our premises liability law should continue to base the occupier's duty of care upon the status of the entrant. Advocates for change argue that a standard of reasonable care under all the circumstances is a more realistic standard in modern society; one that is easily understood and applied because it is used in almost all other tort actions. They argue that a reason may have existed in feudal times and even beyond for the protection of vested property interests, but that modern times demand a recognition that requiring all to exercise reasonable care for the safety of others is the more humane approach. Finally, they argue that the present common-law classifications are rigid and mechanical in application and overly protective of property interests at the expense of human safety.

However, both before and after our decision in *Bowers v. Ottenad*, several jurisdictions elected to modify the duty owed by occupiers of land to persons coming on the property. A majority of jurisdictions still retain the common-law classifications and duties arising from those classifications. Some of those that have changed abolished altogether the classifications and adopted negligence standards calling for the occupier of the lands to exercise reasonable care for the safety of persons coming on their property. Other jurisdictions have elected to retain the classification of trespasser with concomitant duties, but have abandoned the distinction between invitees and licensees. These jurisdictions require an occupier of land to exercise reasonable care under the circumstances for any person entering upon the premises with the express or implied permission of the occupier of the property. For a comprehensive discussion and analysis of those jurisdictions retaining, modifying, and abandoning the common-law classifications, see Annot., 22 A.L.R.4th 295.

Those jurisdictions that reject altogether the common-law status classifications and require an occupier of land to exercise reasonable care under all the circumstances accept the principle that the foreseeability of the injury rather than the injured party's status is the controlling factor in determining liability. See 22 A.L.R.4th at 303-07. Those jurisdictions that have adopted an intermediate position by abolishing the common-law distinctions

between the duties owed to licensees and invitees, while retaining the common-law rules regarding trespassers, generally agree that the foreseeability of the injury ought to be the foundation of liability. See 22 A.L.R.4th at 307-10. We believe that this intermediate position is sound.

The majority of jurisdictions considering this issue have retained the common-law classifications, reasoning that the interest in judicial certainty advanced by the maintenance of well-established and predictable allocations of liability under the common law is best for society. See 22 A.L.R.4th at 310-14. Some courts rejecting change have reasoned that replacement of a stable and established system of loss allocation results in the establishment of a system devoid of standards for liability. It also has been suggested that the harshness of the common-law rules has been ameliorated by the judicial grafting of exceptions and that the creation of subclassifications ameliorated the distinctions between active and passive negligence.

We note that the common-law status distinctions between licensees and invitees have not been adopted by the United States Supreme Court in admiralty law. *Kermarec v. Compagnie Generale*, 358 U.S. 625, 636, 3 L. Ed. 2d 550, 79 S. Ct. 406 (1959). Moreover, England, by passage of the Occupiers' Liability Act of 1957, 5 & 6 Eliz. II, c. 31, abrogated the distinction between licensees and invitees, imposing upon occupiers of land a common duty of care towards all visitors except trespassers.

Fifteen years ago, in *Gerchberg v. Loney*, 223 Kan. 446, this court refused to adopt the standard of reasonable care under all the circumstances for licensees. Not unlike other jurisdictions that have rejected change, we said that such a standard

"would have to be applied by the jury to the specific facts of each case. Can a lay jury be expected to consider the proper relative effect of natural and artificial conditions on the premises which are or may be dangerous, the degree of danger inherent in such conditions, the extent of the burden which should be placed on the possessor of the premises to alleviate the danger, the nature, use, and location of the condition or force involved, the foreseeability of the presence of the plaintiff on the premises, the obviousness of such dangerous condition or the plaintiff's actual knowledge of the condition or force which resulted in injury? It would appear these considerations should be imparted to the jury if it is to be placed in a position to decide whether reasonable care was exercised by the possessor of the premises.

Otherwise the jury will have a free hand to impose or withhold liability." 223 Kan. at 450.

Based upon the same reasoning, we again rejected change in *Britt v. Allen County Community Jr. College*, 230 Kan. 502. Quoting at length from Hawkins, *Premises Liability After Repudiation of the Status Categories: Allocation of Judge and Jury Functions*, Utah L. Rev. 15 (1981), the majority in *Britt* reasoned that it seemed apparent from 80 cases surveyed in that article that courts would still find it necessary to fix the limits of premises liability even after they had repudiated the status categories of entrants on land. 230 Kan. at 507.

However, even the majority in *Britt* notes that Hawkins concludes: " 'In a majority of the cases surveyed the outcome would probably be the same as if the status rules had been applied.' Utah L. Rev. at 56." 230 Kan. at 507. The majority opinion further quotes Professor Hawkins in his conclusions resulting from the survey of 80 cases involving a change from those jurisdictions abolishing classification:

" '1. The preceding discussion reveals that there has not been wholesale abandonment of premises liability cases to jury caprice. Of eighty cases surveyed in jurisdictions that have abolished the status categories, thirty were withheld from juries by directed verdicts or other summary disposition.

" '2. The techniques of case-by-case determination most often used to withhold cases from juries after repudiation of the status categories were: (1) that the defendant owes the plaintiff no duty of reasonable care or that the duty does not extend to the particular risk; and (2) that there was insufficient evidence of negligence. These techniques are well developed in general negligence practice. Occasional resort to the murky dialectic of "proximate cause" is regrettable but no more of a problem in premises liability cases than it is in negligence cases generally.

" '3. Those cases that have been withheld from juries after repudiation of the status categories cannot be explained simply by reference to the type of entrant, the type of landowner or possessor or the type of premises on which the injury occurred. If there is a feature that tends to explain these cases, it would have to be stated very generally in terms of the risk situation. Compared with the fifty cases that reached juries, the thirty cases withheld from them involved proportionately higher frequencies of third-party hazards, natural condition hazards, common and obvious conditions, plaintiff's risky conduct, or bizarre events and proportionately lower frequencies of hidden or latent conditions, and hazards created immediately by defendant's active operations. Since these differences are only relative, it is probably necessary to take into account the court's assessment of further considerations

such as the magnitude of the risk, the gravity of harm, the burden of prevention and the significance of the plaintiff's contributory conduct in the particular circumstances of each case. If that is so, the disposition of the cases appears to be consistent with the handling of negligence cases generally, and the incidence of jury control is consistent with the reform logic that the nature of the entrant's conduct should be considered in evaluating the risk situation, and not just the status of the entrant.' Utah L. Rev. at 53-56." *Britt*, 230 Kan. at 506-07.

Professor Hawkins' conclusion is that our judicial system uses those techniques that are well developed in general negligence practice in handling and applying a standard of "reasonable care under the circumstances." As noted by Justice Prager:

"The point of Professor Hawkins is not that there is no justification for the abolition of the status classifications. His point is that the abolition of the classifications has not resulted in uncontrolled findings of liability on the part of property owners, because, in applying the reasonable man standard, the court has applied the usual protections and safeguards customarily applied in other types of negligence cases." *Britt*, 230 Kan. at 511 (Prager, J., dissenting).

In *Britt*, Justice Prager highlights one of the main criticisms of basing liability on the status of the entrant rather than upon the assessment of the duty of due care of the occupier of the premises. He states:

"The manifest injustice of the distinction between invitees and licensees is well illustrated by the present case. If the plaintiff, Ella May Britt, had been on the premises attending a lecture sponsored by the junior college on another evening and had been injured as the result of the negligence of its employee, she could have recovered for those personal injuries. Her trouble is that she went to the auditorium on the wrong night. Although she may have been injured in the same way by the negligence of an employee of the junior college, the majority have held that she is completely without remedy because she did not have the status of an invitee, since the program was not being sponsored by the junior college. The inherent injustice of the invitee-licensee differentiation becomes quite obvious in this case." *Britt*, 230 Kan. at 511 (Prager, J., dissenting).

This criticism is similar to the following quote from *Rowland v. Christian*, 69 Cal. 2d 108, 118, 70 Cal. Rptr. 97, 443 P.2d 561 (1968), the first case abolishing common-law classifications:

"A man's life or limb does not become less worthy of protection by the law nor a loss less worthy of compensation under the law because he has come upon the land of another without permission or with permission but without a business purpose. Reasonable people do not ordinarily vary their conduct

depending upon such matters, and to focus upon the status of the injured party as a trespasser, licensee or invitee in order to determine the question whether the landowner has a duty of care, *is contrary to our modern social mores and humanitarian* values. The common law rules obscure rather than illuminate the proper considerations which should govern determination of the question of duty." (Emphasis added.)

Our most recent case dealing with this question highlights another criticism leveled by courts rejecting or partially rejecting the common-law status classification. Adoption of a true negligence standard eliminates the complex, confusing, and unpredictable state of law created by courts' attempts to avoid the harshness resulting from rigid application of the traditional rule by increasing the number of classifications. See 22 A.L.R.4th at 299. In *Bowers v. Ottenad*, 240 Kan. 208, plaintiff, a social guest at a dinner party hosted by one of the defendants, was severely burned when the host prepared a flaming Irish coffee. A bottle of alcohol used in preparation for the Irish coffee ignited and fire burst forth in the form of a "fireball." Justice Holmes wrote the majority opinion and traced the development of the doctrine of "active" negligence in the Kansas law of premises liability. He noted in this case that "appellant's injuries were not the result of any defective or dangerous property conditions existing at the Ottenad residence. Rather, the injuries were the result of the activity of appellant and appellees mixing the flaming drinks." 240 Kan. at 213. In arriving at the conclusion that the "active" negligence doctrine was the law of Kansas based upon a historical analysis, Justice Holmes noted:

"An active negligence exception to the premises liability doctrine, as more fully explained in the opinion, is recognized as the law in Kansas and when a licensee, whose presence is known or should be known, is injured or damaged by activity conducted upon the property by the occupier of the property, the duty owed to such person is one of reasonable care under the circumstances. When the injury or damage results from the condition of the premises as opposed to the activity thereon, the duty of the occupier to the licensee is only to refrain from willfully or wantonly injuring the licensee." 240 Kan. 208, Syl. ¶ 4.

Justice Holmes concludes:

"We recognize that there will be instances when it will be difficult to determine whether the alleged negligence falls within the area of an activity carried on by the occupier of the property or is due to the condition of the

premises. However, *the fact that some cases may be difficult for determination is no justification for refusing to recognize a proper rule of law.* Our prior cases, including *Britt v. Allen County Community Jr. College,* 230 Kan. 502; and *Gerchberg v. Loney,* 223 Kan. 446, are overruled to the extent that they are inconsistent with the views expressed in this opinion." (Emphasis added.) 240 Kan. 222-23.

The same may now be said in this case: "[T]he fact that some cases may be difficult for determination is no justification for refusing to recognize a proper rule of law." 240 Kan. at 222-23. That rule does away with the artificial classifications and distinctions arising therefrom between licensee and invitees, classifications that we have recognized no longer fit contemporary society. Adoption of this rule places the focus where it should be rather than upon allowing the duty in a particular case to be determined by the status of the person who enters upon property. We invest judges and juries with the ultimate authority to resolve disputes in our society. We trust the system, and over the years that system has proven admirable in resolving complex problems in tort cases entrusted to its care. Both judges and juries are familiar with and able to apply ordinary negligence standards. Studies suggest that abolition of the distinctions between the duty owed to an invitee and that owed to a licensee has not altered greatly the results reached, has not left the juries without direction or standards by which to judge the action of the occupier of lands, and has resulted in outcomes that would probably be the same as if the status rules had been applied. We believe that the occupier of land owes a duty of reasonable care under the circumstances to all entrants on the property who are present with the occupier's consent.

We hold that in Kansas, the duty owed by an occupier of land to licensees shall no longer be dependent upon the status of the entrant on the land; the common-law classification and duty arising from the classification of licensees shall no longer be applied. The duty owed by an occupier of land to invitees and licensees alike is one of reasonable care under all the circumstances. Included in the factors that are to be considered in determining whether, in the maintenance of his or her property, the land occupier exercises reasonable care under all circumstances are the foreseeability of harm to the entrant, the magnitude of the

risk of injury to others in maintaining such a condition of the premises, the individual and social benefit of maintaining such a condition, and the burden upon the land occupier and/or community, in terms of inconvenience or cost, in providing adequate protection.

At the same time, the effect of the common-law classification of a tort plaintiff as a trespasser is to remain unchanged. A trespasser is defined under Kansas law as one who enters the premises of another without any right, lawful authority, or an express or implied invitation of license. A possessor of the premises upon which a trespasser intrudes owes a trespasser a duty to refrain from wilfully, wantonly, or recklessly injuring him or her. See PIK Civ. 2d 12.20 and 12.21 and comments therein. We have determined that the status of a trespasser retains significance in our contemporary society.

In applying the duty of reasonable care under all the circumstances to licensees as well as invitees, we are mindful that Kansas has recognized that there are limits to "reasonable care." For example, in *Agnew v. Dillons, Inc.*, 16 Kan. App. 2d 298, 300, 822 P.2d 1049 (1991), the Court of Appeals determined that a business proprietor had a duty to use ordinary care to keep those portions of the premises which can be expected to be used by business invitees in a reasonably safe condition. However, the Court of Appeals noted that a proprietor or operator of a trade or business is not an absolute insurer of the safety of the customers. *Agnew* determined "that a business proprietor, absent unusual circumstances, does not breach the duty of ordinary care by not removing snow or ice from outdoor surfaces during a storm and a reasonable time thereafter." 16 Kan. App. 2d at 304. *Agnew* concluded that "[a] requirement that a business proprietor continually expend effort, during a winter storm, to remove frozen precipitation from outdoor surfaces would essentially be a requirement to insure the safety of invitees and is a burden beyond that of ordinary care." 16 Kan. App. 2d 298, Syl. ¶ 3.

We believe that the *Agnew* rationale and those cases cited in support of the *Agnew* rationale are supported by sound public policy. Because we have adopted a standard of reasonable care under all circumstances with respect to all persons who are on property with the occupier's consent, we believe that the *Agnew*

case and reasoning therein applies with equal force and will help define the duty of "reasonable care" in future premises liability cases involving licensees.

Perhaps the rationale of our decision may be best expressed through the words of Justice Cardozo:

"I think that when a rule, after it has been duly tested by experience, has been found to be inconsistent with the sense of justice or with the social welfare, there should be less hesitation in frank avowal and full abandonment. . . . There should be greater readiness to abandon an untenable position when the rule to be discarded may not reasonably be supposed to have determined the conduct of the litigants, and particularly when in its origin it was the product of institutions or conditions which have gained a new significance or development with the progress of the years. . . . If judges have woefully misinterpreted the mores of their day, or if the mores of their day are no longer those of ours, they ought not to tie, in helpless submission, the hands of their successors." Cardozo, The Nature of the Judicial Process, pp. 150-52 (1921).

In the words of Justice Prager:

"A cardinal principle of tort law today is that *all persons* should be required to use ordinary care under the circumstances to prevent others from being injured as the result of their conduct. Although it is true that some exceptions have been made to this general principle, no such exception should be made unless clearly supported by some sound public policy." *Gerchberg v. Loney*, 223 Kan. at 456 (Prager, J., dissenting).

Having adopted a new rule by adopting a standard of reasonable care under all the circumstances for licensees and invitees in premises liability cases, we conclude that this new rule is to be applied prospectively from the date of this decision. Prior to this decision, all citizens were on notice of premises liability law in the State of Kansas. We deem it, therefore, fair to apply this new rule prospectively, with the exception of the parties to this action.

Upon remand, it remains an open question whether the facts of this particular case would warrant a summary judgment under the new rule adopted by this court. Defendants note in their brief before the trial court: "It is questionable whether plaintiff's evidence is sufficient to present a question of negligence of the defendants." The trial court in its decision noted: "It may be ordinary negligence, it may not be." Because of the law in existence at the time this matter was argued on motion for summary

judgment, the only question was whether the defendants' actions were wanton. The parties did not present or argue whether the defendants' actions under all the circumstances were negligent. It remains for determination by the trial court whether, under the new rule adopted by this court, the defendants are entitled to summary judgment.

Reversed and remanded for further proceedings consistent with this opinion.

McFARLAND, J., dissenting: I concur in the dissenting opinion of Justice Six. The traditional classifications relative to premises liability constitute a cornerstone of tort law in Kansas which has been reaffirmed on multiple occasions in recent years. For no legally supportable reason, the majority abandons our prior decisions. This result is wholly contrary to the important doctrine of stare decisis.

Black's Law Dictionary 1406 (6th ed. 1990) states the following relative to the doctrine of stare decisis, in pertinent part:

"Policy of courts to stand by precedent and not to disturb settled point. Neff v. George, 364 Ill. 306, 4 N.E.2d 388, 390, 391. Doctrine that, when court has once laid down a principle of law as applicable to a certain state of facts, it will adhere to that principle, and apply it to all future cases, where facts are substantially the same; regardless of whether the parties and property are the same. Horne v. Moody, Tex. Civ. App., 146 S.W.2d 505, 509, 510. Under doctrine a deliberate or solemn decision of court made after argument on question of law fairly arising in the case, and necessary to its determination, is an authority, or binding precedent in the same court, or in other courts of equal or lower rank in subsequent cases where the very point is again in controversy. State v. Mellenberger, 163 Or. 233, 95 P.2d 709, 719, 720."

An excellent summary of Kansas case law relative to the doctrine of stare decisis is contained in Chief Justice Schroeder's dissent in *Bowers v. Ottenad*, 240 Kan. 208, 226-27, 729 P.2d 1103 (1986), wherein he stated:

"Few decisions have been written elaborating on the doctrine of stare decisis because it has been so basic in the teaching of the law throughout the centuries. Students of the law are thoroughly indoctrinated by the proposition that an appellate court's decision is *binding authority* upon itself as well as upon inferior courts. The binding effect concerning the law enunciated by our Supreme Court decisions upon the district courts of Kansas was emphatically discussed by Justice Harold Herd in a concurring opinion

in *State v. McQuillen,* 236 Kan. 161, 174-75, 689 P.2d 822 (1984). The doctrine must also be given respect by the jurists on the appellate court of last resort in the state.

"Addressing the doctrine of stare decisis, Justice Alex Fromme, writing for the court in *Guffy v. Guffy,* 230 Kan. 89, 96-97, 631 P.2d 646 (1981), said:

'It is not always easy to determine the proper ambit of the court's authority on an issue of the present kind. We must not discard the time-tested advantages of consistency and uniformity in the fabric of the law to do that which we might conceive to be justice in a particular instance. . . . We as judges may have the power, though not the right, to ignore the ultimate effects of legislative pronouncements. History teaches us that departures from clear principles of law lead to more and more departures, many of which for the moment may seem in the highest public interest; but, when that happens, the day will soon come when personal preferences of judges overcome long established principles, and the law instead of being rules governing action becomes vacillating judgments dependent upon the particular membership of the court at any given time.

' "The judge, even when he is free, is still not wholly free. He is not to innovate at pleasure. He is not a knight-errant roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield a spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to 'the primordial necessity of order in the social life.' " Cardozo, The Nature of the Judicial Process, at 141 (1921).'

". . . . That doctrine [stare decisis], its literal Latin meaning being 'let the decision stand,' is essential to maintaining certainty and stability in the legal community. By this doctrine, attorneys are able to advise their clients and their clients, in turn, are able to behave accordingly.

"In the early case of *Beamish v. Beamish,* 9 H.L. Cas. *274, *338 (1861), it was said that an appellate court's decision is binding authority upon itself as well as upon inferior courts. The function of the judiciary is not to make the law, but to ascertain and apply existing law to the facts before it. The fact the composition of the court may have changed since an earlier decision is not sufficient reason to overrule established precedent set by that earlier decision. This court has stated the doctrine of stare decisis is not inflexible, and that if an earlier decision is *clearly erroneous* or conditions have changed materially, the earlier rule should be set aside. *Hillhouse v. City of Kansas City,* 221 Kan. 369, 372, 559 P.2d 1148 (1977); *Steele v. Latimer,* 214 Kan. 329, 332-33, 521 P.2d 304 (1974); *In re Estate of Preston,* 193 Kan. 145, 148, 392 P.2d 922 (1964); *Warburton v. Warkentin,* 185 Kan. 468, 476, 345 P.2d 992 (1959)."

In the case before us, the rationale for departure from the rule of stare decisis is stated as follows:

"A majority of this court believes that a partial change in our premises liability law is warranted as more reflective of modern social mores and as a more reasonable method of fault ·determination in our society."

This is obviously not a determination that our prior decisions were erroneous. The majority finds it is adopting "a more reasonable method." Inherent in this statement is that the existing method is reasonable. If we were deciding a case of first impression, and choosing between two alternatives, such a rationale could be asserted. That is not the situation herein. This leaves us with the determination that the change is "warranted as more reflective of modern social mores." Presumably, this is intended to be the equivalent of the alternative justification for not following the doctrine of stare decisis—conditions having changed materially. To test this justification, let us first examine our prior decisions.

In 1978, the same challenge made herein to the traditional classifications was made in *Gerchberg v. Loney*, 223 Kan. 446, 576 P.2d 593 (1978), and rejected. We stated:

"The traditional classification of trespassers, licensees and invitees and the distinctions as to the duty of care owed to each came to this country with the common law and has been applied generally in this country. This system of classification which began in England was first discarded by that country in 1957 by way of a statute which imposed the same duty of care to licensees and invitees. The statute declared that the possessor of premises owes the same 'common duty of care' to both, with reasonable care modified according to the circumstances of the entry. (Occupiers' Liability Act, 5 & 6 Eliz. 2, c. 31. Discussed in Prosser, Law of Torts, 4th Ed., Ch. 10, § 62, p. 398.)

"In considering the question of whether this state should discard all classifications and distinctions two things should be noted concerning the change in England. First, the. change to a common duty of reasonable care did not extend to trespassers and second, the use of a jury in negligence actions had virtually disappeared in England and these actions were being tried to the court.

"In the nine or ten states in this country which have discarded the traditional classifications it was concluded that their courts were confused by the classifications and would be better able to instruct their juries in premises cases if the standard of reasonable care were required under all circumstances. It was generally agreed in those states that a jury should determine the circumstances which would relieve a possessor of premises from liability to a trespasser, an invitee and a licensee. We doubt the validity of those conclusions. It should be kept in mind that in England negligence

cases are tried to the court without a jury. This is not so in the United States.

"It has been argued that additional instructions to the jury to the effect that it should consider the foreseeability of plaintiff's presence on the premises, the foreseeability of possible harm, the likelihood that others would not appreciate or be aware of the danger, and the extent of the burden on the possessor to remove the danger or notify of the risk would sufficiently protect the possessor of the premises. These general admonitions to a lay jury may or may not suffice.

"If the traditional classifications are discarded the legal distinctions which have heretofore governed the courts in imposing a particular standard of care are also discarded. In such case the standard, reasonable care under all the circumstances, would have to be applied by the jury to the specific facts of each case. Can a lay jury reasonably be expected to consider the proper relative effect of natural and artificial conditions on the premises which are or may be dangerous, the degree of danger inherent in such conditions, the extent of the burden which should be placed on the possessor of premises to alleviate the danger, the nature, use and location of the condition or force involved, the foreseeability of the presence of the plaintiff on the premises, the obviousness of such dangerous condition or the plaintiff's actual knowledge of the condition or force which resulted in injury? It would appear these considerations should be imparted to the jury if it is to be placed in a position to decide whether reasonable care was exercised by the possessor of the premises. Otherwise the jury will have a free hand to impose or withhold liability.

"A majority of the members of this court do not feel that the traditional classifications of trespassers, licensees and invitees should be jettisoned. The traditional classifications were worked out and the exceptions were spelled out with much thought, sweat and even tears by generations of Kansas legal scholars who have gone before us. Should this body of law be discarded completely in favor of a free hand by a lay jury? We feel at this time there is too much of value in our premises law with respect to rights of possessors of premises to warrant its abandonment.

"It should be noted that the adoption of one standard of care not only will have the effect of lowering the standard of care owed to trespassers and licensees but also would lower the standard of care presently owed to invitees. Under our present law the duty owed to an invitee is active and positive. It includes a duty to protect and warn an invitee against any danger that may be reasonably anticipated. Not only does it extend to dangerous conditions known to the possessor but also to dangerous conditions discoverable in the exercise of a duty to inspect and keep the premises free of unreasonable risk of harm.

"It has been suggested that the jury need not be left without guidance even though the traditional classifications are discarded. It is further suggested that after a jury is advised of the single standard of care the court can further instruct the jury by setting out the applicable rules found in

the Restatement of the Law, Second, Torts, §§ 333 through 343B. The Restatement classifies these rules as follows: Title B. Liability of Possessors of Land to Trespassers; Title C. General Liability of Possessors of Land to Licensees and Invitees; Title D. Special Liability of Possessors of Land to Licensees; and Title E. Special Liability of Possessors of Land to Invitees. If such a suggestion is followed in advising the jury what if anything is gained by discarding the traditional rules? The traditional classifications (trespassers, licensees and invitees) are still to be considered by the court. If, as the appellant suggests, the traditional classifications are confusing, unreasonable and arbitrary any change which embraces the Restatement rules will be subject to similar charges. In such case we would be merely changing the extent of the duty owed by a possessor of premises. The extent of that duty would still be dictated by the circumstances surrounding entry on the premises, the danger involved and the burden to be placed on the possessor to make the premises reasonably safe. The traditional classifications would remain but the traditional rules worked out over so many years would be discarded and new rules governing a possessor's liability would have to be relearned.

"A majority of this court feel if the mores and values of present society dictate changes such changes should be worked out individually as the circumstances of a particular case may warrant. Such changes will result in less general confusion and better understanding of each particular change.

. . . .

"In conclusion we wish to acknowledge what has been referred to as a trend in this country toward abolition of the traditional classifications. Apparently the bellwether case in the United States was handed down in 1968, *Rowland v. Christian*, 69 Cal. 2d 108, 70 Cal. Rptr. 97, 443 P.2d 561 [1968]. Our research indicates that in the ten years which have elapsed since *Rowland* only nine states have followed the lead. During this same period of time several states have elevated licensees to a common class with invitees, and five states have placed social guests in the category of invitees. During this same period of time a large majority of states have continued to follow the traditional common law classifications. At least six states have considered the advisability of following *Rowland v. Christian*, supra, and have declined to do so. The jurisdictions which have abolished all classifications are not sufficient in number to constitute a clear trend." 223 Kan. at 449-54.

In *Zuther v. Schild*, 224 Kan. 528, 581 P.2d 385 (1978), we again rejected the proposed discarding of the traditional classifications.

In 1982 the challenge was made again in *Britt v. Allen County Community Jr. College*, 230 Kan. 502, 638 P.2d 914 (1982). In the opinion we discussed the results of the research done by Professor Carl S. Hawkins as to what the effect of modification

of the traditional classifications was in those states which had made the change. Justice Fromme, writing for the majority, concluded:

"It seems apparent from the findings resulting from the above survey of cases, that courts still find it necessary to fix the limits of premises liability even after they have repudiated the status categories of entrants on land. The professor, agreeing with the conclusion expressed in Henderson, *Expanding the Negligence Concept: Retreat from the Rule of Law*, 51 Ind. L.J. 467 (1976), states 'that in the absence of some structure for fixing the limits of premises liability, the law would be reduced to "a conceptual conduit through which all cases are funneled into the jury room." ' Utah L. Rev. at 61.

"Again, after reconsideration, a majority of the members of this court do not feel that the landowner's duty to licensees in the traditional premises law of this state should be changed. The possessor of premises on which a licensee enters owes the licensee a limited duty to refrain from willfully or wantonly injuring the entrant. *Zuther v. Schild*, 224 Kan. at 529." 230 Kan. at 507.

In *Bowers v. Ottenad*, 240 Kan. 208, 729 P.2d 1103 (1986), the challenge was again made. Justice Holmes, writing for the majority, stated:

"Appellant raises several issues, only two of which require consideration here. First, appellant contends that this court should abandon the common-law premises doctrine which establishes liability of a landowner or occupier of real property based upon the status of the injured party and adopt the traditional negligence standard of reasonable care under all the existing circumstances, at least to the extent of adopting such standard for licensees. Second, it is asserted that if this court does not consider it appropriate to abandon the existing premises doctrine we should follow the active negligence exception recognized by this court in *Montague v. Burgerhoff*, 150 Kan. 217, 92 P.2d 98 (1939).

"As to the first issue, whether we should abandon the common-law doctrine of premises liability based upon the status of the injured party as a trespasser, licensee, or invitee, much has been written in recent years. This court has been asked on at least four occasions to abandon the premises liability or status classification doctrine of landowner or occupier liability and on each occasion a majority of the court has declined to do so. *Britt v. Allen County Community Jr. College*, 230 Kan. 502, 638 P.2d 914 (1982); *Zuther v. Schild*, 224 Kan. 528, 581 P.2d 385 (1978); *Gerchberg v. Loney*, 223 Kan. 446, 576 P.2d 593 (1978); *Frazee v. St. Louis-San Francisco Rly. Co.*, 219 Kan. 661, 549 P.2d 561 (1976). We see nothing to be gained by rehashing the pros and cons of the argument as they are adequately covered in our existing cases. Suffice it to say, a majority of the members of this court remains of the opinion that there are compelling reasons not to depart

from the existing doctrine. The traditional common-law doctrine of premises liability based upon the status of the party injured or damaged as a trespasser, licensee, or invitee is approved and confirmed as the law of this state. We therefore decline to overrule the cases cited." 240 Kan. at 210-11.

The active negligence exception was recognized and clarified in *Bowers*.

The majority opinion cites *Rowland v. Christian*, 69 Cal. 2d 108, 70 Cal. Rptr. 97, 118, 443 P.2d 561 (1968), the bellwether case on abrogation of the traditional classifications, emphasizing the language thereof that application of such classifications "is contrary to our modern social mores and humanitarian values."

This court rejected that rationale in *Gerchberg* in 1978. Nor has Kansas been alone in so doing.

Prosser and Keeton on The Law of Torts § 62, pp. 432-34 (5th ed. 1984) makes the following highly pertinent observations:

"The traditional distinctions in the duties of care owed to persons entering land—based upon the entrant's status as a trespasser, licensee or invitee—have been criticized for some time as being harshly mechanical, unduly complex, and overly protective of property interests at the expense of human safety. In 1957, England by statute abolished the distinction between licensees and invitees, and imposed upon the occupier a 'common duty of care' toward all persons who lawfully enter the premises. This was followed in the United States in 1958 by a Supreme Court decision refusing to engraft the traditional distinctions onto the law of admiralty. Ten years thereafter, in 1968, the Supreme Court of California in Rowland v. Christian abolished the traditional duty classification scheme for trespassers, licensees and invitees, and replaced it with the ordinary negligence principles of foreseeable risk and reasonable care. Over the next ten or twelve years, eight other jurisdictions followed suit, abolishing all distinctions between entrants on land, and another five jurisdictions discarded the distinctions between licensees and invitees but retained the traditional duty limitations toward trespassing adults.

"*Although the abolition movement gathered impressive momentum through the mid-1970s, it thereafter quite abruptly lost its steam, and in 1979 it came to a screeching halt.* All six courts passing on the issue from then until 1982 have reaffirmed their commitment to the traditional trespasser-licensee-invitee classification scheme. It is still too early to determine whether this most recent shift in attitude toward the entrant categories will prove to be only a momentary rest stop on the long march toward a general overthrow of this entire system of legal doctrine. Instead, *it may reflect a more fundamental dissatisfaction with certain developments in accident law that accelerated during the 1960s—the reduction of whole systems of legal*

*principles to a single, perhaps simplistic, standard of reasonable care, the sometimes blind subordination of other legitimate social objectives to the goals of accident prevention and compensation, and the commensurate shifting of the decisional balance of power to the jury from the judge. At least it appears that the courts are gaining a renewed appreciation for the considerations behind the traditional duty limitations toward trespassing adults, and that they are acquiring more generally a healthy skepticism toward invitations to jettison years of developed jurisprudence in favor of a beguiling legal panacea.* (Emphasis supplied.)

The majority herein has opted to jettison years of developed jurisprudence in favor of this "beguiling legal panacea." In 1978 in *Gerchberg*, 223 Kan. 446, we recognized *Rowland v. Christian*, 69 Cal. 2d 108, for what it was—the seductive Siren's song—and likewise rejected it in 1978, 1982, and 1986.

What has happened since the Prosser and Keeton cut-off date of 1982? An extensive pertinent annotation appears in 22 A.L.R.4th 294. The September 1993 Supplement thereto, at page 47, lists the following states as having expressly considered and rejected abrogation of the traditional classifications (case cites omitted herein):

Alabama (federal court applying Alabama law) (1984)
Arkansas (1988)
Connecticut (1992)
Florida (1982)
Idaho (1987)
Indiana (1982)
Kansas (1986)
Kentucky (1988)
Maryland (1984)
Montana (federal court applying Montana law) (1985)
Ohio (1988)
Oklahoma (1985)
Pennsylvania (1989)
Texas (1985)
Washington (1986).

On page 46 of the 1993 supplement, Colorado, Illinois, Montana, and New York are listed as having recognized the ordinary care standard to licensees and invitees alike in decisions filed between 1984 and 1986.

The majority opinion herein is clearly not following any modern trend. It is, in fact, not only turning its back on our well-established law but also is swimming against the stream of current opinion in other states on this issue.

As previously noted, under the doctrine of stare decisis this court is bound by its own prior decisions. Exceptions thereto are if the prior decisions are clearly erroneous or there are materially changed conditions. The majority opinion justification is that the change "is warranted as more reflective of modern social mores," which ostensibly equates to materially changed conditions. To justify departure from our prior cases, there must be materially changed conditions. What are the changed conditions which warrant the departure from our prior decisions?

The majority opinion does not state what social mores have changed that justify the abrogation of Kansas law. Surely, if changed mores are to justify the decisions reached by the majority, they should be discussed in some detail or at least named with sufficient particularity that they can be identified.

Further, a time frame is needed in which to judge the validity of the changes, circumstances, or mores the majority is relying upon. Have social mores changed since 1978 (*Gerchberg* and *Zuther*); 1982 (*Britt*); or 1986 (*Bowers*)? Or does the majority ignore our prior decisions in deciding to reject their rationale and go clear back to the Old English common law when the landed gentry were presumably being protected from claims of landless peasants? There is no way of determining the time frame in which the majority is operating.

Stare decisis would have little meaning if, no matter how frequently the same issue arises, the court compares historical English social conditions with those of the current year. The issue is whether to change the existing law of Kansas. Under the doctrine of stare decisis, only significant material changes occurring since 1986 should be considered, or, at the earliest, the date should be 1978. The majority identifies no such changes as none exist. The rationale of our decision in the 1970s and 1980s is just as valid now as then and, arguably, more so.

The classifications have been developed over many years and are grounded in reality. In the real world there are enormous differences between businesses and residences. Businesses extend

invitations to prospective customers, clients, etc., to come to their places of business for commercial purposes. Persons so coming are, for the most part, personally unknown to those extending the invitation. It is anticipated these invitees will roam freely about the public areas of businesses, and a part of the cost of doing business is providing reasonably safe premises. These establishments are, ordinarily, professionally designed, built, and equipped. Safety and convenience account for much of their sterile uniformity.

Residences are designed to please the homeowners and meet their needs and wants. A residence reflects the homeowners' individuality and is equipped and operated by the homeowners according to how they want to live. We live in the age of the do-it-yourselfer. Few homes would meet OSHA's standards, and few individuals would desire to live in such a home. Modern businesses do not have polished hardwood floors, throw rugs, extension cords, rough flagstone paths, stairways without handrails, unsupervised small children, toys on the floor, pets, and all the clutter of living—homes do. There are good reasons behind the old adage that most accidents occur in the home.

Here, we are specifically concerned with the business invitee and social guest in the home. The argument is made: Why should liability rest on the injured party's status as a business invitee or social guest (licensee)? As any homeowner knows, the business invitee is in the residence on a much different basis than is the social guest. The invitee is there for a limited specific purpose. For example, when the Maytag man is called to repair the washing machine, he is shown where the machine is and advised of the machine's problem. The repairperson will be in the laundry room or wherever the machine is located. If he or she wants to go to the basement to check the plumbing, or use the bathroom or the telephone, permission and location are asked. The homeowner shows the repairperson where the basement, phone, bathroom, etc. is. The repairperson does not have free run of the premises. The homeowner knows just where the repairperson is. If there is a known hazard with which the repairperson will be in contact, such as a frayed electrical cord on the washing machine, it is logical to require that a warning be given. Likewise, if an insurance agent comes in to discuss insurance, he or she

will be escorted to a particular place and seated. If the homeowner goes to the kitchen to get coffee, he or she has every reason to expect the agent to be exactly where the agent was seated. The social guest, on the other hand, is there on a much more informal basis and can be anywhere in the residence. Commonly, guests are told to leave their coats on the bed upstairs while the homeowner returns to the kitchen to finish meal preparations. Relatives and close friends wander at will, making themselves at home, as the saying goes. The homeowner simply does not have the awareness of all guests' locations in mind at all times or even know where they might be. Social guests and hosts take each other as they are, in a relaxed informal situation.

The idea that one's home is one's castle has even greater meaning today. The increasing crime rate makes many people afraid to be away from home at night. Their safe sanctuary is their home. The cares, concerns, and pressures of their lives make the home this sanctuary. Over and over again, one hears victims of residential burglaries describe their feelings as being those of violation or of psychological rape. Their one safe place is not safe any more. This is an area where people have an expectation of privacy—a carefully guarded term in criminal law. Our times produce high frustration levels—not only from crime but also from increasing job and economic pressures, governmental restrictions on activities, etc.

One's home is where one can be oneself. Neighbors, relatives, and friends stop by to visit. Our highly mobile society makes social visits more common than ever. To place the same standard on an individual in his or her home relative to a social guest as in a business relationship entails an unreasonable intrusion.

How can a homeowner protect himself or herself from liability? Must the homeower close out the world, padlock off-limit areas, make the home a safe sterile place devoid of individuality, post warning signs, lock up children and pets, regiment all guests, forbid the children to invite friends over, or eliminate all elderly or handicapped persons as persons who may enter the home socially?

Even if the homeowner is not negligent, it will take a jury trial, in most instances, to determine that fact. Interestingly, the jury, in determining whether or not the defendant homeowner

has exercised reasonable care, will be considering, *inter alia*, the status of the injured guest. The circumstances of the visit are an integral part of a foreseeability determination.

There is another serious effect from the majority's decision. Present day homeowners and renters insurance rates in Kansas reflect our present law on premises liability. The potential for increased liability and defense costs, whether in real or exaggerated terms, will be used to justify increased premiums for such insurance.

Kansas has, in the past, created exceptions to the present standards where justified and can continue to do so in the future (active negligence, attractive nuisance, etc.). In this manner, undue hardship can be ameliorated while adhering to the basic principles.

As used in this dissent, "homeowner" includes individuals who rent or lease the premises in which they reside. The majority decision is not just adding a burden to the landed estate owner; the homeowner of even the most modest residence or apartment will be subject to far greater liability than exists at present.

The case before us is a sleeper in every sense of the word. It raises an issue that has been put to rest. No new argument is made in support of the proposed change. There is a serious question whether the issue is even properly before us. Yet, one of the basic tenets of well-established Kansas law is being dramatically altered with no sound or sufficient reason being stated in the majority opinion to justify such a change. Stare decisis is grounded on very important principles. A body of law is established on precedent in order that people will know what the law is and can depend on it. Lawyers can hardly advise their clients as to the law if precedent means nothing.

Our established law is neither clearly erroneous, nor has there been a material change in circumstances justifying a change. This court is, accordingly, bound by our prior decisions. If a change is to be considered on a public policy basis, it should be addressed to the legislature, where the public policy may be determined after the receipt of input from all parties potentially affected thereby.

I would adhere to our existing law and affirm the district court.

SIX, J., dissenting: I concur in the dissenting opinion of Justice McFarland. I write separately to state why I believe the current law of premises liability should be retained and once again re-affirmed.

Plaintiff Jones' petition alleged that "defendants' actions constituted wanton conduct and active negligence" because of the way the Hansens positioned their pictures, the failure to warn Jones about the stairwell, failure to block the stairwell, and failure to adequately light the room. The record does not contain an amended petition or motion to amend the petition. The Hansens answered Jones' claims by denying the allegations of wanton conduct and active negligence. Discovery proceeded on the wanton conduct theory selected by Jones and identified by her allegations.

The Hansens moved for summary judgment because the undisputed facts neither supported an allegation of wanton conduct nor showed that Jones was injured during an activity, as in *Bowers v. Ottenad*, 240 Kan. 208, 729 P.2d 1103 (1986). The Hansens contended that under Kansas law, a social guest claiming an injury resulting from a condition of her host's premises was entitled to recover only on proof of willful or wanton conduct.

In her response to defendants' summary judgment motions, Jones argued that the Hansens were "guilty of wanton conduct" because the bookcase hid the stairway from view, the lighting was kept "low as to obscure the existence of the stairway," the pictures were hung evenly over the stairway rather than in a descending way to indicate the presence of the stairway, and Mrs. Hansen invited Jones to view the paintings and did not warn Jones or provide adequate lighting. Jones argued, in general, that summary judgment is not usually appropriate in negligence actions. Jones acknowledged that she was a licensee and at least implicitly acknowledged that she must show wanton conduct in order to recover. She argued primarily that a plaintiff need not prove a defendant's willingness to injure in order to establish wanton conduct.

The Hansens' reply memorandum addressed the propriety of summary judgment in negligence actions and the duty owed to a licensee under Kansas law. The only mention below of Jones' appellate contention that Kansas law should be changed is in the

oral argument on the summary judgment motion. The tangential reference in Jones' argument was as follows: "We think . . . it's time that the court—higher court needs to consider changing and adopting the Restatement of Torts, which is a much more realistic view of the way the world works."

Although counsel told the trial court during oral argument that he thought Kansas law should be changed, I question whether the issue was preserved for appeal. The trial court granted summary judgment based on its conclusion that Jones had to prove the injury occurred during an activity on the Hansens' property or as a result of willful and wanton conduct. The trial court did, however, as the majority notes, tell plaintiff, "You'll have an opportunity to argue the policy decisions to the higher court."

Was counsel's reference during oral argument sufficient to preserve the premises liability classification issue? In order for an appellate court to determine an issue, the issue must have been raised and determined at the trial court level. *Farm Bureau Mut. Ins. Co. v. Old Hickory Cas. Ins. Co.*, 248 Kan. 657, 662, 810 P.2d 283 (1991). In *Farm Bureau*, we declined to rule on an issue raised in, but not determined by, the district court. Jones' assertion at oral argument that the law should be changed is not sufficient to preserve the issue for appeal. In *Enlow v. Sears, Roebuck & Co.*, 249 Kan. 732, 822 P.2d 617 (1991), we declined to consider the appellant's *res ipsa loquitur* claim because she raised it for the first time at oral argument on defendant's motion to dismiss. Enlow neither included the *res ipsa* theory in the pretrial order nor requested a jury instruction. 249 Kan. at 737-38. Similarly, in the instant case, Jones raised the premises liability classification issue only at oral argument. She did not reference the issue in her petition or argue it in her written reply to defendants' motion for summary judgment. She cited no authority to the trial court, nor did she request a ruling on the issue by the trial court. Under *Enlow*, Jones has not preserved the issue for appeal. In the case at bar, there is no indication in the record that Jones questioned established premises liability law prior to oral argument on the Hansens' summary judgment motion.

Our jurisdiction is "to correct, modify, vacate or reverse any act, order or judgment of a district court or court of appeals in

order to assure that any such act, order or judgment is just, legal and free of abuse." K.S.A. 1992 Supp. 60-2101(b). We do not have a district court decision to review with respect to the change in premises liability law briefed and argued cn appeal. The entire case proceeded in the trial court on the theory that the Hansens' wanton misconduct allegedly caused Jones' injury. The majority relies on *Board of Sedgwick County Comm'rs v. Kiser Living Trust*, 250 Kan. 84, Syl. ¶ 8, 825 P.2d 130 (1992), reasoning that an appellate court may consider an issue not presented to the trial court when the issue is a question of law that may be decided on established facts. The facts in *Kiser* which form the basis for syllabus ¶ 8 involved a matter decided by the trial court, *i.e.* an award of attorney fees. See 250 Kan. at 105. We interpreted on appeal K.S.A. 26-509, the statute the trial court had relied on in allowing attorney fees in a bench trial. In *Kiser,* the county had not objected in the trial court to fees for the landowner's attorneys. The objection came on appeal. We entertained the issue of interpreting K.S.A. 26-509. The factual distinction between *Kiser* and the case at bar is that the statute we interpreted in *Kiser* was used by the trial court as the basis for the attorney fee award. In the case at bar, the status of established premises liability law was never presented to the trial court. In my view, something more than counsel's wishful reference for a policy change made in oral argument at the end of trial court proceedings is required to place an issue before this court.

We welcome *amicus curiae* briefs as valuable assets in our appellate work. Experience demonstrates that interested associations frequently move for permission to file as *amici curiae* under Rule 6.06 (1993 Kan. Ct. R. Annot. 29). No such motions have been filed in the case at bar. The majority's decision will arrive as a surprise. Neither the pleadings below nor the decision of the trial court involved a challenge to our established law of premises liability. We should have invited comment from interested associations alerting such associations that the court was entertaining the issue of a policy change in premises liability law.

The majority's new premises liability standard is prospective as of the date of this opinion. The majority's opinion, except as to the instant parties, should carry an effective date later than the date of the opinion. When the court departs from the rule

of stare decisis, the application of the new rule should not result in hardship to those who have relied upon prior decisions of the court. *Carroll v. Kittle,* 203 Kan. 841, 851, 457 P.2d 21 (1969).

The United States Supreme Court recently revisited the role of stare decisis speaking through Justices O'Connor, Kennedy, and Souter in *Planned Parenthood v. Casey,* 505 U.S. ____, 120 L. Ed. 2d 674, 112 S. Ct. 2791 (1992). Selected comments from the stare decisis analysis in *Casey* are instructive in evaluating the efficacy of the majority's rationale for overruling our premises liability law.

The Supreme Court stated:

"[W]hen this Court reexamines a prior holding, its judgment is customarily informed by a series of prudential and pragmatic considerations designed to test the consistency of overruling a prior decision with the ideal of the rule of law, and to gauge the respective costs of reaffirming and overruling a prior case. Thus, for example, we may ask whether the rule has proved to be intolerable simply in defying practical workability, *Swift & Co. v. Wickham,* 382 U.S. 111, 116, 15 L. Ed. 2d 194, 86 S. Ct. 258 (1965); whether the rule is subject to a kind of reliance that would lend a special hardship to the consequences of overruling and add inequity to the cost of repudiation, *e.g., United States v. Title Ins. & Trust Co.,* 265 U.S. 472, 486, 68 L. Ed. 1110, 44 S. Ct. 621 (1924); whether related principles of law have so far developed as to have left the old rule no more than a remnant of abandoned doctrine, see *Patterson v. McLean Credit Union,* 491 U.S. 164, 173-174, 105 L. Ed. 2d 132, 109 S. Ct. 2363 (1989); or whether facts have so changed or come to be seen so differently, as to have robbed the old rule of significant application or justification, *e.g., Burnet [v. Coronado Oil & Gas Co.,* 285 U.S. 393,] 412, 76 L. Ed. 815, 52 S. Ct. 443 [1932] (Brandeis, J., dissenting)." 120 L. Ed. 2d at 700.

"[A] decision to overrule should rest on some special reason over and above the belief that a prior case was wrongly decided. See, *e.g., Mitchell v. W. T. Grant,* 416 U.S. 600, 636, 40 L. Ed. 2d 406, 94 S. Ct. 1895 (1974) (Stewart, J., dissenting) ('A basic change in the law upon a ground no firmer than a change in our membership invites the popular misconception that this institution is little different from the two political branches of the Government. No misconception could do more lasting injury to this Court and to the system of law which it is our abiding mission to serve'); *Mapp v. Ohio,* 367 U.S. 643, 677, 6 L. Ed. 2d 1081, 81 S. Ct. 1684, 84 A.L.R. 2d 933 (1961) (Harlan, J., dissenting)." 120 L. Ed. 2d at 706.

"There is a limit to the amount of error that can plausibly be imputed to prior courts. If that limit should be exceeded, disturbance of prior rulings would be taken as evidence that justifiable reexamination of principle had given way to drives for particular results in the short term. The legitimacy

of the Court would fade with the frequency of its vacillation." 120 L. Ed. 2d at 708.

"The promise of constancy, once given, binds its maker for as long as the power to stand by the decision survives and the understanding of the issue has not changed so fundamentally as to render the commitment obsolete." 120 L. Ed. 2d at 709.

The majority opinion candidly observes: "A majority of jurisdictions still retain the common-law classifications and duties arising from those classifications." Overruling established premises liability law is not justified, particularly when this court discards a legal concept of common-law classification held by a majority of jurisdictions and endorses a minority view.

The trial court in the case at bar should be affirmed.

LOCKETT, J., joins the foregoing dissenting opinions.